# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.

JAMEL HUNT,

     Defendant.

_____/

Case No. 18-20037
HON. DENISE PAGE HOOD

## ORDER GRANTING DEFENDANT'S EMERGENCY MOTION FOR IMMEDIATE REDUCTION OF SENTENCE (COMPASSIONATE RELEASE) [ECF No. 37]

## I.    Introduction

Defendant has filed an Emergency Motion for Immediate Reduction of Sentence (Compassionate Release) [ECF No. 37] (the "Motion"), pursuant to the First Step Act of 2018 and 18 U.S.C. § 3582(c)(1)(A)(i).  Defendant asks the Court to modify his 30 month term of imprisonment to time served and to impose a special condition that he serve a period of home confinement on supervised release. Defendant asserts that this will allow him to protect himself, the Bureau of Prisons ("BOP") at FCI Milan, and the community from the spread of the Novel Coronavirus 2019 ("COVID-19"), by sheltering in place at his residence.  The Government has filed a response in opposition to Defendant's Motion.

1

## II.     Background

In October 2007, Defendant was sentenced to a term of probation under the Holmes Youthful Trainee Act ("HYTA") after committing an armed robbery.  While on probation, Defendant twice violated the court's order by drug trafficking and committing the crimes of felony firearm and armed robbery. Defendant was sentenced to three years for the armed robbery and a consecutive sentence of two years for the felony firearm.  Defendant was released on parole on May 20, 2014, and he was discharged from supervision two years later.

On July 27, 2017, law enforcement discovered evidence that resulted in the charges upon which Defendant was convicted in this case – the creation and possession of more than 15 fraudulent credit cards based on stolen identities. Defendant stated he learned how to conduct this type of fraud while in prison with the Michigan Department of Corrections ("MDOC").  He would purchase the stolen accounts from various websites and then met with someone to have the fraudulent cards created on device making equipment.

Defendant entered a guilty plea on two counts: (1) possession of fifteen or more unauthorized access devices; and (2) aggravated identity theft.  He was  sentenced to a term of 30 months imprisonment and 12 months of supervised release.  Defendant is housed at FCI Milan and has served approximately 30% of his 30 month custodial

sentence, as his projected release date is July 16, 2021.  Defendant has not been subject to discipline since his incarceration, and he is presently a trustee at Milan facility. He is at the lowest security level, and he states that, prior to the facility's lock down due to COVID-19, he was granted passes that allowed him to go outside the gates, without restraints.

Defendant is approximately 30 years old, and he suffers from recently diagnosed but serious underlying and pre-existing medical conditions.  Those conditions include, but are not limited to congestive heart failure, diabetes mellitus (type two), asthma, obesity, and sleep apnea. He claims to be symptomatic in his conditions because he experiences chest pain and shortness of breath and has to monitor his conditions closely to prevent complications. Defendant represents that he currently is prescribed medication to help alleviate the symptoms associated with his diagnosis, has been hospitalized multiple times in the last six months, and is being managed by the FCI Milan health clinic. Defendant contends that this combination of conditions place him in the COVID-19 highest-risk category.

Defendant states that, when he entered prison, he was a healthy human being. Since then, he has been hospitalized for respiratory distress, and a medical team performed an echocardiogram and chest x-ray. The echocardiogram measured how the blood was moving through the heart and diagnosed heart failure. The normal ejection

fraction of an adult heart is between 55%-70%, but Defendant's ejection fraction is severely limited, pumping at only 12%. His ejection fraction is so low the heart muscle is not contracting effectively to pump out blood from the left ventricle of his heart to allow the bronchioles in the lungs to exchange carbon dioxide or waste with oxygen in the air or environment to travel to the rest of his body to provide oxygenated rich blood to his major organs and tissues. As a result, Defendant's cardiac complications caused him to have acute respiratory distress causing pulmonary edema or pleural effusion (fluid in his lungs). He represents that this is very commonly seen in patients with heart failure because of the relationship between the heart and lungs and how they work synergistically.

Defendant's chest x-ray showed fluid around his lungs. To treat the fluid around his lungs, the medical team performed a procedure called "thoracentesis" (also known as a pleural tap). This procedure involves insertion of a small needle below the rib cage into the lungs to remove the excess fluid. Defendant was discharged on anti-hypertensive medications to maintain his heart, a diuretic to help rid some of the fluid to prevent hospitalization and to be continually monitored by the nurses at the prison. Defendant has been hospitalized two more times to have this procedure repeated because of his heart condition continuously causing fluid around his lungs. After an October 2019 hospital visit, follow up care revealed that Defendant requires

4

a cardiac defibrillator ("ICD") to address his heart failure.[1]

Defendant contends that, because he suffers from these illnesses, and due to the close quarters and the inability to follow social distancing, to wear protective gear, or to follow any of the CDC protocols to be safe from COVID-19, he has been exposed to COVID-19. He argues that he is unable to be transported to the hospital to be tested for illnesses because of the fear of the exposure to COVID-19.

On April 28, 2020, counsel for the Government spoke with Dr. Scherle, who oversees Defendant's care, and was told Defendant is being housed in the C-Unit where he is quarantined to prevent his exposure to COVID-19. According to a BOP official who government's counsel communicated within the last few days, inmates at FCI Milan, where Defendant is housed, who have been identified as "At Risk for COVID-19" by Health Services, may be assigned to live in C-Unit. These selected inmates, like Defendant, currently have not displayed any symptoms for COVID-19. The purpose of C-Unit, is to mitigate possible exposure for these at risk inmates. Sanitation and avoiding all cross contamination are key to limiting the risk of exposure for these inmates. See *BOP FAQs: Correcting Myths and Misinformation*.

---

[1] The Government states that, when Defendant self-reported to Milan on July 18, 2019, the BOP diagnosed and began treating Defendant for multiple health issues about which Defendant had been previously unaware. It states contends that the BOP's vigilant intake assessment screening and health monitoring uncovered Defendant's health issues which, left untreated, would likely have led to Defendant's demise.

And, orderlies have been assigned to maintain a high state of sanitation, inside of C-Unit.

Defendant claims to have very strong family ties, including a wife who is employed at Sinai Grace Hospital as a nurse, a three year old daughter, and his mother, all of whom are very supportive of him. Defendant states that, if the Motion is granted, he will live with his wife and daughter at a private residence in Redford, Michigan, where he has the ability to quarantine for 14 days. Defendant represents that his wife will be able to put him on her health insurance plan. Prior to his incarceration, he was employed at the Greenfield Plaza in Southfield, Michigan. Defendant represents that he has been advised that he can return to that employment. He contends that he does not present a danger to the safety of any person or the community.

Defendant states that he "recently" made a request to the warden at FCI Milan for compassionate release.  Defendant does not say when he made that request, but it is undisputed that the BOP has not had 30 days to address Defendant's request.

## III.   Analysis

As amended by the First Step Act, 18 U.S.C. § 3582(c)(1)(A) authorizes courts to modify terms of imprisonment as follows (emphasis added):

> The court may not modify a term of imprisonment once it has been imposed except that—in any case—**the court**,

upon motion of the Director of the Bureau of Prisons, or **upon motion of the defendant** after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, **may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment)**, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--

> (i) extraordinary and compelling reasons warrant such a reduction ... and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A)(i) therefore requires that a defendant must satisfy both the exhaustion requirement and demonstrate that "extraordinary and compelling reasons" warrant a reduction of his sentence.

A.    *Exhaustion*

The Government asserts that the Court does not have jurisdiction to address Defendant's COVID-19-based argument because he has yet to exhaust his administrative remedies as required by statute. See 18 U.S.C. § 3582(c)(1)(A). The Court acknowledges that a number of courts have denied applications for sentence modification under § 3582(c)(1)(A) brought on the basis of the risk posed by COVID-19, citing the fact that the defendant failed to exhaust administrative

7

remedies. *See, e.g.*, *United States v. Alam*, Case No. 15-20351, 2020 WL 1703881, at

*2 (E.D. Mich. Apr. 8, 2020) (Cox, J.) (quoting *Ross v. Blake*, 136 S.Ct. 1850, 1857

(2016)) (denying a motion for compassionate release due to the COVID-19 outbreak

for failure to exhaust) (also citing may cases from across the country holding the

same); *United States v. Matthews*, No. 14-20427, ECF No. 320 at PgID 2111-13 (E.D.

Mich. Apr. 15, 2020) (Ludington, J.) (a court cannot waive the statutorily created

exhaustion requirement under 3582(c)(1); *United States v. Zywotko*, No. 2:19 Cr. 113,

2020 WL 1492900, at *1 (M.D. Fla. Mar. 27, 2020); *United States v. Garza*, No. 18

Cr. 1745, 2020 WL 1485782, at *1 (S.D. Cal. Mar. 27, 2020); *United States v.

Eberhart*, No. 13 Cr. 00313, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020);

*United States v. Hernandez*, No. 19 Cr. 834, 2020 WL 1445851, at *1 (S.D.N.Y. Mar.

25, 2020); *United States v. Gileno*, No. 19 Cr. 161, 2020 WL 1307108, at *3 (D.

Conn. Mar. 19, 2020).

There are circumstances where failure to exhaust may be excused as

unnecessary, specifically where: (1) it would be futile, either because agency decision

makers are biased or because the agency has already determined the issue; (2) the

administrative remedy process would be incapable of granting adequate relief; or (3)

where pursuing agency review would subject the prisoner to undue prejudice. *See,

e.g., United States v. Saad*, No. 16-20197, ECF No. 65, PgID 705 (E.D. Mich. May

5, 2020) (Hood, C.J.); *United States of America v. Wilson Perez*, 17 Cr. 513 (S.D.N.Y. 4/1/2020) (citing *Washington v. Barr*, 925 F. 3d 109, 118 (2d Cir. 2019) (citing *McCarthy v. Madigan*, 503 U.S. 140, 146-47 (1992)). Numerous courts have agreed. *See, e.g.,United States v. Zukerman*, No. 16 CR. 194 (AT), 2020 WL 1659880, at **2–4 (S.D.N.Y. Apr. 3, 2020); *United States v. Colvin*, No. 19 Cr. 179, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020) ("[I]n light of the urgency of [d]efendant's request, the likelihood that she cannot exhaust her administrative appeals during her remaining eleven days of imprisonment, and the potential for serious health consequences, the [c]ourt waives the exhaustion requirement of Section 3582(c)(1)(A)."); *United States v. Powell*, 94 Cr. 316, ECF No. 98 (D.D.C. Mar. 28, 2020) (waiving exhaustion under § 3582(c)(1)(A) where the [c]ourt found that "requiring defendant to first seek relief through the [BOP] administrative process would be futile").

Defendant argues that his health, in light of COVID-19, places him in extraordinary and compelling reasons for early release and meets other criteria. For the reasons that follow, the Court holds that, due to the unique and unforeseen threat posed by the COVID-19 pandemic to this Defendant because of his specific health conditions, the exhaustion of administrative process can be waived.

The Court notes the following language from *Zukerman*:

Section 3582(c)(1)(A) imposes "a statutory exhaustion requirement" that "must be strictly enforced." *United States v. Monzon*, No. 99 Cr. 157, 2020 WL 550220, at *2 (S.D.N.Y. Feb. 4, 2020) (citing *Theodoropoulos v. I.N.S.*, 358 F.3d 162, 172 (2d Cir. 2004) (internal quotation marks and alterations omitted)).[] However, as this Court and others have held, the requirement of completing the administrative process may be waived "if one of the recognized exceptions to exhaustion applies." *United States v. Perez*, No. 17 Cr. 513-3, 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020); see *United States v. Colvin, No. 1*9 Cr. 179, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020) ("[I]n light of the urgency of [d]efendant's request, the likelihood that she cannot exhaust her administrative appeals during her remaining eleven days of imprisonment, and the potential for serious health consequences, the [c]ourt waives the exhaustion requirement of Section 3582(c)(1)(A)."); *United States v. Powell*, 94 Cr. 316, ECF No. 98 (D.D.C. Mar. 28, 2020) (waiving exhaustion under § 3582(c)(1)(A) where the [c]ourt found that "requiring defendant to first seek relief through the [BOP] administrative process would be futile").

"Even where exhaustion is seemingly mandated by statute ..., the requirement is not absolute." *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019) (citing *McCarthy v. Madigan*, 503 U.S. 140, 146–47 (1992)).[] There are three circumstances where failure to exhaust may be excused. "First, exhaustion may be unnecessary where it would be futile, either because agency decisionmakers are biased or because the agency has already determined the issue." *Id*. Second, "exhaustion may be unnecessary where the administrative process would be incapable of granting adequate relief." *Id*. at 119. Third, "exhaustion may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice." *Id*.

All three of these exceptions apply here. "[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile. Moreover, the relief the agency might provide could, because of undue delay, become inadequate. Finally, and obviously, [Zukerman] could be unduly prejudiced by such delay." *Washington*, 925 F.3d at 120–21; *see Bowen v. City of New York*, 476 U.S. 467, 483 (1986) (holding that irreparable injury justifying the waiver of exhaustion

requirements exists where "the ordeal of having to go through the administrative process may trigger a severe medical setback" (internal quotation marks, citation, and alterations omitted)); *Abbey v. Sullivan*, 978 F.2d 37, 46 (2d Cir. 1992) ("[I]f the delay attending exhaustion would subject claimants to deteriorating health, ... then waiver may be appropriate."); *New York v. Sullivan*, 906 F.2d 910, 918 (2d Cir. 1990) (holding that waiver was appropriate where "enforcement of the exhaustion requirement would cause the claimants irreparable injury" by risking "deteriorating health, and possibly even ... death"); *see also Perez*, 2020 WL 1546422, at *2–3 (holding that § 3582(c)(1)(A)'s exhaustion requirement could be waived where delay carried the risk of the vulnerable defendant contracting COVID-19). Here, even a few weeks' delay carries the risk of catastrophic health consequences for Zukerman. The Court concludes that requiring him to exhaust administrative remedies, given his unique circumstances and the exigency of a rapidly advancing pandemic, would result in undue prejudice and render exhaustion of the full BOP administrative process both futile and inadequate.

To be sure, "the policies favoring exhaustion are most strongly implicated" by challenges to the application of existing regulations to particular individuals. *Pavano v. Shalala*, 95 F.3d 147, 150 (2d Cir. 1996) (internal quotation marks, citation, and alterations omitted). Ordinarily, requests for a sentence reduction under § 3582(c) would fall squarely into that category. But "courts should be flexible in determining whether exhaustion should be excused," *id.* at 151, and "[t]he ultimate decision of whether to waive exhaustion ... should also be guided by the policies underlying the exhaustion requirement." *Bowen*, 476 U.S. at 484. The provision allowing defendants to bring motions under § 3582(c) was added by the First Step Act, in order to "increas[e] the use and transparency of compassionate release." 132 Stat. 5239. Requiring exhaustion generally furthers that purpose, because the BOP is best situated to understand an inmate's health and circumstances relative to the rest of the prison population and identify "extraordinary and compelling reasons" for release. 18 U.S.C. § 3582(c)(1)(A)(i). In Zukerman's case, however, administrative exhaustion would defeat, not further, the policies underlying § 3582(c).

11

*Zukerman*, 2020 WL 1659880, at **2–3 (footnotes omitted).

The Court finds that there are several factors that weigh in favor of Defendant's release from FCI Milan. Although Defendant is only about 30 years old, he suffers from congestive heart failure, diabetes mellitus (type two) and sleep apnea, and he has been hospitalized three times in the last nine months for issues stemming from his congestive heart failure. Pursuant to the COVID-19 pandemic, it appears to the Court that Defendant's health conditions place him in the "highest risk category for complications and death from the disease if infected." *See, e.g., Zukerman*, 2020 WL 1659880, at *4; *Basank v. Decker*, 2020 WL 1481503, at *3 (S.D.N.Y. Mar. 26, 2020) ("The Court takes judicial notice that, for people . . . with underlying health problems, COVID-19 causes severe medical conditions and has increased lethality.") (citation omitted). Even if the Court were to accept the argument that the BOP and FCI Milan are taking precautions to ensure the safety of prisoners, Defendant's risk of contracting COVID-19 is not speculative. There have been numerous cases of COVID-19 at FCI Milan, both among prisoners and staff.

The Court is cognizant that Defendant is not scheduled to be released for more than two years, but it cannot ignore that the threat of COVID-19 exists now. As set forth above, Defendant: (a) has serious known underlying illnesses; (b) is detained in a facility where positive cases of the virus have been found; and (c) like other inmates,

Defendant is unable to take adequate measures to protect himself.

The Court holds that Defendant's serious health conditions and the high risk of contracting COVID-19 at FCI Milan justify the waiver of the exhaustion requirement.

### B.     Extraordinary and Compelling Reasons

The Government contends that, even if the Court asserts jurisdiction, Defendant's history and conditions do not warrant a compassionate release under the statute. 18 U.S.C. § 3582(c)(1)(A). Because § 3582(c)(1)(A) requires that release be "consistent with" the Sentencing Commission's policy statements, Defendant's failure to meet the criteria in U.S.S.G. § 1B1.13 alone forecloses relief. Even when COVID-19 is taken into account, the Government argues that Defendant's age and medical conditions do not satisfy the requirements in U.S.S.G. § 1B1.13(1)(A) & cmt. n.1. The Government states that Defendant's health has been and continues to be proactively monitored by BOP staff at Milan, where they have diagnosed and are successfully treating Defendant's medical conditions with surgical and non-surgical measures.

The Government states that Defendant tested negative for COVID-19 on April 11, 2020, ECF No. 42, Ex. B(2020 Medical Records, at 1), and as noted above, Defendant is being housed in the C-Unit where he is quarantined to prevent his exposure to COVID-19 and none of the selected inmates have displayed any

symptoms for COVID-19. The Government asserts that placement in the C-Unit is a far safer place for Defendant than returning to Detroit to live with his wife, a practicing nurse at Sinai-Grace Hospital, which is an epicenter of the COVID-19 pandemic. Citing https://www.freep.com/story/news/health/2020/04/13/ michigan-coronavirus-dead-bodies-refrigerated-trucks-sinai-grace-hospital/298638 3001/.

The Government contends that Defendant is being safeguarded at Milan, but he could become exposed to COVID-19 by his wife if released. The Government states that, whether his wife works directly with COVID-19 patients or not, she is still in an environment and around individuals or co-workers exposed to it. For this reason, the Government asserts that Defendant's argument for a safer release to home fails considerably.

Although the sentence imposed on Defendant was just, the Court holds that the threat posed by COVID-19, in light of Defendant's underlying health conditions, constitutes an "extraordinary and compelling reason" to modify his sentence under 18 U.S.C. § 3582(c)(1)(A)(I).  As stated by the *Zukerman* court, "[t]he severity of [Defendant]'s conduct remains unchanged. What has changed, however, is the environment where [Defendant] is serving his sentence. When the Court sentenced [Defendant], the Court did not intend for that sentence to 'include incurring a great

14

and unforeseen risk of severe illness or death' brought on by a global pandemic."
*Zukerman*, 2020 WL 1659880, at *6 (citing *United States v. Rodriguez*, 2020 WL
1627331, at *12 (E.D. Pa. Apr. 1, 2020)).

The United States Sentencing Commission has defined "extraordinary and
compelling reasons." *See* U.S.S.G. § 1B1.13, comment n.1.  There are extraordinary
and compelling reasons for modification where "[t]he defendant is ... suffering from
a serious physical or medical condition ... that substantially diminishes the ability to
provide self-care within the environment of a correctional facility and from which he
or she is not expected to recover." U.S.S.G. § 1B1.13 comment n.1(A)(ii).

In this case, Defendant's congestive heart failure, diabetes, , and sleep apnea
meet that requirement. As the World Health Organization has determined, the
populations most at risk of suffering severe health risks from COVID-19 include
"those with underlying medical conditions (such as cardiovascular disease, diabetes,
chronic respiratory disease [asthma], and cancer)." Coronavirus, World Health
Organization (May 5, 2020), https://www.who.int/docs/default-source/coronavirus/
situation- reports/20200311-sitrep-51-covid-19.pdf?sfvrsn=1ba62e57_10. According
to the United States Center for Disease Control, individuals of any age who have
serious underlying medical conditions, including serious heart conditions, diabetes,
asthma, and obesity are at higher risk for severe illness from COVID-19. People Who

Are at Higher Risk for Severe Illness, Centers for Disease Control and Prevention (April 27, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/ people-at-higher-risk.html.

Defendant is among those persons most at risk. This Court and others have held that compassionate release is justified under such conditions. *See, e.g., United Statest v. Saad, supra*; *United States v. Doshi*, No. 13-20349, ECF No. 145 (E.D. Mich. Mar. 31, 2020) (recommending that the BOP release 64 year old defendant with diabetes and hypertension to home confinement); *Perez*, 2020 WL 1546422, at *4 (the defendant was at risk of experiencing serious complications from COVID-19 due to medical complications arising from two vicious beatings while he was incarcerated); *Colvin*, 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020) (finding "extraordinary and compelling reasons justifying ... immediate release under Section 3582(c)(1)(A) and U.S.S.G. § 1B1.13" where defendant has "diabetes, a serious medical condition which substantially increases her risk of severe illness if she contracts COVID-19" (internal quotation marks, citation, and alteration omitted)); *Rodriguez*, 2020 WL 1627331, at *7 (granting compassionate release where defendant was "in the higher risk category for developing more serious disease" if exposed to COVID-19 because he "has Type 2 diabetes mellitus with diabetic neuropathy, essential hypertension, obesity, and abnormal liver enzymes in a pattern most consistent with non-alcoholic fatty liver

disease") (internal quotation marks and citations omitted); *United States v. Jepsen*, 19 Civ. 73, 2020 WL 1640232, at *5 (D. Conn. Apr. 1, 2020) (granting compassionate release to defendant who "is immunocompromised and suffers from multiple chronic conditions that are in flux and predispose him to potentially lethal complications if he contracts COVID-19"); *United States v. Gonzalez*, No. 18 Cr. 1536155, 2020 WL 1536155, at *3 (approving compassionate release where defendant "is in the most susceptible age category (over 60 years of age) and her COPD and emphysema make her particularly vulnerable"); *United States v. Muniz*, 09 Cr. 199, 2020 WL 1540325, at *2 (finding extraordinary and compelling circumstances because "[d]efendant has been diagnosed with serious medical conditions that, according to reports from the Center[s] for Disease Control, make him particularly vulnerable to severe illness from COVID-19 ... includ[ing] inter alia, end stage renal disease, diabetes, and arterial hypertension."); *United States v. Campagna*, No. 16 Cr. 78-01, 2020 WL 1489829, at *3 (S.D.N.Y. Mar. 27, 2020) (approving compassionate release for defendant where his "compromised immune system, taken in concert with the COVID-19 public health crisis, constitutes an extraordinary and compelling reason to modify [d]efendant's sentence on the grounds that he is suffering from a serious medical condition that substantially diminishes his ability to provide self-care").

For the reasons stated above, the Court finds that Defendant has demonstrated

that extraordinary and compelling reasons justify a modification of his term of imprisonment.

C.      *Defendant's History*

The Government argues that Defendant's offense and criminal history make him a danger to the community, *see* U.S.S.G. § 1B1.13(2), and a weighing of the § 3553(a) factors support continued detention.  The Government states that Defendant is a two-time armed robber and drug trafficker who quickly recidivated and was arrested for the instant offense approximately a year after discharge from parole.  The Government also argues that Defendant used his time during state incarceration to learn how to commit the instant offense.  For these reasons, the Government contends that Defendant has proven that he is unwilling to abide by society's most basic norms, such that he is not likely to abide by the CDC's social-distancing protocols or other COVID-19-based restrictions if released.   Based on Defendant's history, the Government contends that Defendant is: (1) likely to recidivate; and (2) unlikely to comply with conditions of release, social-distancing protocols, and stay-at-home orders, placing himself and others at risk of COVID-19 infection.

The Court notes the Government's position but finds that, in light of the COVID-19 pandemic, the enhanced health risks if Defendant remains incarcerated, and the manner in which Defendant's release can be conditioned, a consideration of

the § 3553(a) factors does not support continued detention of Defendant. Most significantly, once released, Defendant will be subject to home confinement with electronic location monitoring. During this period of home confinement, between the electronic location monitoring and the other conditions of his release (including a prohibition on the use of computers and the internet), Defendant's ability to commit a crime will be severely diminished.

### D.    Conclusion

The BOP recently was allowed to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement." Coronavirus Aid, Relief, and Economic Security Act (CARES Act), § 12003(b)(2), Pub. Law 116-136, 134 Stat 281, 516 (Mar. 27, 2020). The Attorney General has issued two directives to the BOP ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic." (03-26-2020 Directive to BOP, at 1; 04-03-2020 Directive to BOP, at 1). The statutory authorities include the requirements in 18 U.S.C. § 3624(c) and (g) for home confinement in general, as well as the requirements in 34 U.S.C. § 60541(g) for some elderly and terminally ill offenders. The directives require the Bureau of Prisons to identify the inmates most at risk from COVID-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether

home confinement is appropriate. (03-26-2020 Directive to BOP, at 1). Finally, the directives instruct the Bureau of Prisons to consider "all at-risk inmates—not only those who were previously eligible for transfer" into home confinement. (04-03-2020 Directive to BOP, at 2).

For the reasons stated above, the Court grants Defendant's Emergency Motion for Immediate Reduction of Sentence (Compassionate Release) pursuant to 18 U.S.C. § 3582(c)(1)(A). The Court reduces Defendant's sentence to time served, and the Court imposes a term of supervised release equal to the unserved portion of his original term of imprisonment (as calculated by the BOP). The Court understands that Defendant has been in the C-Unit for more than 14 days ago and no C-Unit inmate has tested positive or showed symptoms of COVID-19 for at least that long. The Court therefore finds it unnecessary for the BOP to hold Defendant for a 14-day quarantine in order to protect the public and orders the BOP to release Defendant immediately.

Defendant shall serve the new term of supervised release under home confinement, with electronic location monitoring to commence as soon as the Probation Department can safely install the necessary electronic monitoring equipment and upon such other conditions as the Probation Department deems necessary. The original 12 month period of supervised release is canceled.

## IV.    Conclusion

Accordingly,

IT IS ORDERED that Defendant's Emergency Motion for Immediate Reduction of Sentence (Compassionate Release) [ECF No. 37] is GRANTED.

IT IS FURTHER ORDERED that Defendant's sentence of imprisonment is reduced to time served.

IT IS FURTHER ORDERED that the BOP shall release Defendant immediately, without holding for a 14-day quarantine period at FCI-Milan, and Defendant shall remain self-quarantined for 14 days after release.

IT IS FURTHER ORDERED that, immediately upon release, Defendant shall commence a new term of supervised release that is equal to the unserved portion of his original term of imprisonment (as calculated by the BOP).

IT IS FURTHER ORDERED that Defendant shall serve the new term of supervised release under home confinement, with electronic location monitoring to commence as soon as the Probation Department can safely install the necessary electronic monitoring equipment and upon such other conditions as the Probation Department deems necessary.

IT IS FURTHER ORDERED that, within 24 hours of release from BOP custody, Defendant shall call the Probation Department to schedule an appointment.

IT IS FURTHER ORDERED that Defendant's original 12 month term of

supervised release imposed by the Court is canceled.

IT IS ORDERED.


Dated: May 12, 2020                    s/Denise Page Hood
                                       DENISE PAGE HOOD
                                       UNITED STATES DISTRICT JUDGE